# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-2917

_____

Loren Noreen,

*Plaintiff - Appellant,*

v.

PharMerica Corporation,

*Defendant - Appellee.*

------------------------------

AARP,

*Amicus on Behalf of Appellant.*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 17, 2016
Filed: August 19, 2016

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Loren Noreen sued his former employer, PharMerica Corporation, alleging that the company terminated his position and then refused to rehire him because of his age, in violation of federal and Minnesota law. The district court[1] granted summary judgment for PharMerica. We agree that there is no genuine issue of material fact for trial, and we therefore affirm.

## I.

PharMerica is a national pharmaceutical company that employs more than 4,500 people and provides pharmacy services to nursing homes and hospitals. From 1975 through December 30, 2013, PharMerica employed Noreen as a pharmacist. During the time relevant here, Noreen worked at PharMerica's office in Fridley, Minnesota. His responsibilities included evaluating medication orders, making recommendations to physicians and staff for changes in therapy, and working with pharmacy technicians in monitoring inventory.

In 2012, one of PharMerica's clients terminated its corporate contract with PharMerica. Due to the loss of business, PharMerica implemented a reduction in force ("RIF") at the Fridley location in September 2012.

PharMerica has guidelines that set forth a process for selecting which employees are terminated in a RIF. The guidelines state presciently that "[t]o protect the Company, it is imperative that this process be followed consistently," and that "[e]ach step must be documented." RIF decisions are to be "made in a non-

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

discriminatory manner." Because of federal regulations, however, the decisions are reviewed by the company "for adverse impact on protected classes."

The guidelines describe a multi-step approach for carrying out a RIF. First, the company identifies affected locations and the positions to be eliminated in each job category at those locations. Next, a reviewer fills out a "RIF Decision Matrix form," a multi-tabbed spreadsheet that "rank[s] employees within the affected job categories based on their current documented Annual Performance Evaluation rating." Each employee receives a letter grade (O, E, M, NI, U) in a column on the matrix form according to his or her last performance evaluation rating. These letters translate to Outstanding, Exceeds Expectations, Meets Expectations, Needs Improvement, and Unacceptable. If an employee has not been with PharMerica long enough to receive an annual performance evaluation rating, the reviewer should assign a rating based on two checkups, a ninety-day evaluation, and input from supervisors and co-workers.

At the third step of the guidelines, the reviewer should "[s]ub-rank ALL employees within the Performance Evaluation rating from highest to lowest." In other words, according to Noreen, the reviewer should sub-rank all employees who received an "NI" grade in one group, all employees who received an "M" rating in a second, all employees rated at "E" in a third, and so forth. The matrix form provides multiple columns, wherein a reviewer can score various work-related factors, including an employee's productivity, versatility, communication, self-management, and reliability. Those factors are averaged, and a reviewer relies on them when calculating a sub-ranking.

Once completed, the matrix form is sent to a human resources generalist along with any appropriate documentation. The generalist then reviews the matrix form and analyzes it for adverse impact on "protected classes per Federal guidelines" before submitting the form for final review and approval.

The guidelines provide that if the rankings are upheld after review, then "persons will be selected for RIF based on being the lowest ranking." The most natural reading of this instruction is that employees in a lower performance evaluation rating group—say "Needs Improvement"—would be terminated first, starting with the lowest ranked in the group. If more terminations are required, then the reviewer would proceed to the next highest rating group, say "Meets Expectations," and proceed according to rankings within that group.

Corey Rife, the regional pharmacy director, filled out the matrix form for the September 2012 RIF at the Fridley office. Rife sub-ranked all thirteen pharmacists as a single group. Eleven pharmacists had a last performance rating of "Meets Expectations." Two recently hired pharmacists did not have an annual performance evaluation rating; Rife neglected to follow the guidance to give them a letter grade based on other data, but he included them in the sub-rankings. The company terminated the pharmacist with the lowest sub-ranking. She was a recent hire, the youngest of the group, with no performance rating.

Another RIF occurred at the Fridley office in December 2012. This time, the location's new pharmacy director, Daniel Teich, completed the matrix form. Again, all the pharmacists were sub-ranked together. And, again, one of the pharmacists was a recent hire for whom no performance evaluation rating was listed. The company terminated the two pharmacists with the lowest sub-rankings; one was the recent hire.

PharMerica anticipated additional business losses near the end of 2013, so another RIF occurred in October 2013. Teich filled out the matrix form for the Fridley office. On this occasion, the staff pharmacists showed a variety of performance evaluation ratings: NI, M, and E. Nonetheless, Teich sub-ranked all of the pharmacists as a single group. The pharmacist with the lowest sub-ranking was terminated.

The last RIF at the Fridley office took place in December 2013, because a contract with the company's primary client expired at the end of the year. PharMerica acquired operations from another pharmacy around the same time, but it was uncertain whether new business would offset the loss of the primary client, so Rife and Teich proceeded with the RIF.

Teich again prepared the matrix form. Four pharmacists, including Noreen, showed a last performance rating of M; one was graded E, and two were graded NI. Teich again sub-ranked all of the staff pharmacists together in a single group. Noreen (rated "M") and another pharmacist (rated "NI") had the lowest sub-rankings and were selected for termination. One pharmacist with a rating of "NI" was retained, because Teich sub-ranked him higher than Noreen.

On December 30, 2013, Rife and Teich informed Noreen that his position was terminated because of PharMerica's loss of business. Rife told Noreen that he could reapply for open positions. During the course of the meeting, Noreen became upset and told Rife and Teich that his termination was a "Pearl Harbor screw job." Rife worried that a physical confrontation might occur, so he asked Teich to leave the meeting. Although Rife had conducted many RIFs with the company, he had "not once had a reduction in force that took this tone," and he viewed Noreen's behavior as "very unprofessional."

In early 2014, anticipating new business from the corporate acquisition, PharMerica posted job openings for several pharmacists at the Fridley location, and Noreen applied. Because the anticipated increase in business did not materialize, however, the posted positions were never filled.

In March 2014, a staff pharmacist at the Fridley location resigned. Teich considered hiring Noreen, but ultimately rejected that idea because of the threatening

manner in which Noreen departed from the company. Teich hired a person with whom he had worked at another company.

In April 2014, Noreen filed a charge of discrimination with the Equal Employment Opportunity Commission and the Minnesota Department of Human Rights. After the EEOC issued a right-to-sue letter, Noreen filed this action, alleging age discrimination in violation of federal and state civil rights laws. The district court granted PharMerica's motion for summary judgment, reasoning that Noreen had failed to establish a submissible case that PharMerica discriminated against him because of his age. Noreen appeals.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to Noreen. *Otto v. City of Victoria*, 685 F.3d 755, 758-59 (8th Cir. 2012). We may affirm on any ground supported by the record. *See Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014) (en banc).

II.

Federal law forbids an employer from refusing to hire or discharging an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). It is also an unfair employment practice under Minnesota law to discharge an employee or to refuse to hire a person "because of . . . age." Minn. Stat. § 363A.08, subd. 2(1), (2); *see* Minn. Stat. § 181.81, subd. 1. Noreen brought claims under these three statutes and sought damages. The company responded that the specific reason for Noreen's termination was his ranking in one of the two lowest positions on the matrix form for the December 2013 RIF. The record was fully developed in the district court on PharMerica's motion for summary judgment, so we may turn directly to the question

whether Noreen has presented sufficient evidence to raise a genuine issue for trial on the ultimate question of age discrimination *vel non*. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983); *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 688 (8th Cir. 2009).

The governing standard appears to differ under the federal and state age discrimination laws. The federal statute, 29 U.S.C. § 623(a)(1), forbids discrimination "because of" age, and the statute thus requires a plaintiff to show that a forbidden reason was the but-for cause of the adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 180 (2009). In cases arising under Minnesota Statute § 363A.08, however, the Minnesota Supreme Court has ruled that a plaintiff must establish that a prohibited reason "more likely than not motivated" the defendant in taking an adverse action. *See Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 627 (Minn. 1988); *LaPoint v. Family Orthodontics, P.A.*, 872 N.W.2d 889, 892-93 (Minn. Ct. App. 2015); *see also Holtzman v. HealthPartners Servs., Inc.*, No. C7-02-375, 2002 WL 31012186, at *4-5 (Minn. Ct. App. Sept. 10, 2002). This approach allows a plaintiff to prevail even if the defendant has a legitimate reason for the disparate treatment. *LaPoint*, 872 N.W.2d at 892-93. While the parties cite no case addressing Minnesota Statute § 181.81, we think it likely that Minnesota courts would take a similar approach with this statute. *Cf. Mittelstadt v. Emergency Physicians Prof'l Ass'n*, No. A08-0879, 2009 WL 1047903, at *5 (Minn. Ct. App. Apr. 21, 2009) (applying the same evidentiary framework to claims brought under § 181.81 and § 363A.08). We address first whether Noreen has established a genuine issue for trial under the more generous Minnesota standard.

Noreen's principal argument is that PharMerica's deviation from its RIF guidelines in December 2013 supports his claim of discrimination. He asserts that Teich ranked all pharmacists together, contrary to the guidelines, when Teich should have ranked the pharmacists within separate subgroups based on their last

performance evaluation ratings. Teich's approach resulted in Noreen's termination, because he received one of the two lowest sub-rankings. Noreen contends that if Teich had followed the guidelines, then the company first would have laid off the two pharmacists with "Needs Improvement" ratings, and Noreen would have been retained based on his higher "Meets Expectations" grade.

This court has recognized that an employer's failure to follow its own policies may support an inference of discriminatory motive when the departure affects only one person. *Hilde v. City of Eveleth*, 777 F.3d 998, 1007 (8th Cir. 2015); *Floyd v. Mo. Dep't of Soc. Servs.*, 188 F.3d 932, 937 (8th Cir.1999). But we also have explained that departures from policy do not support an inference of discrimination when the variation is applied more generally. *Floyd*, 188 F.3d at 937; *see Chock v. Nw. Airlines, Inc.*, 113 F.3d 861, 864-65 (8th Cir. 1997); *cf. Rademacher v. FMC Corp.*, 431 N.W.2d 879, 883 (Minn. Ct. App. 1988).

Teich did not follow the most natural reading of the written guidelines, because he did not divide the employees into groups based on their performance evaluation ratings before sub-ranking the employees. The record establishes, however, that it was a consistent practice of PharMerica to sub-rank all employees together within a job category regardless of their respective performance evaluation ratings. Teich, Nelson, and Rife all testified that they followed this procedure.

The matrix forms reflect this practice. The reviewer who prepared matrix forms at Fridley in August 2013, October 2013, and December 2013 ranked all pharmacists together, despite the presence of last performance evaluation ratings at three different levels. App. 224, 242, 245. Matrix forms from September 2012 and December 2012 also ranked all pharmacists together. App. 239, 506. In the 2012 instances, every pharmacist with a rating was graded at the same level ("M"), but the reviewer also included new pharmacists without any performance evaluation rating. Noreen points to no evidence that the company *ever* followed a process of sub-

ranking the pharmacists within different subgroups according to last performance evaluation ratings.

Noreen emphasizes that he scored a higher last performance evaluation than one of the employees who was retained in December 2013. But this fact does not support an inference that the company manipulated the process because of his age. Unlike *Hilde*, where the employer manipulated only Hilde's scores, 777 F.3d at 1007, PharMerica consistently sub-ranked all pharmacists together and consistently relied on those sub-rankings when making termination decisions. The company's practice could have disadvantaged other pharmacists with higher relative performance evaluations during earlier RIFs if those pharmacists had scored poorly on the sub-rankings. Without evidence of any inconsistent practice or manipulation directed at Noreen, there is insufficient evidence to infer age discrimination from the company's repeated failure to follow the written guidelines.

Noreen also relies on statistics. He asserts that the average age of staff pharmacists was 54.1 when Teich became the pharmacy director at Fridley but decreased to age 46.8 when Teich left. The mere recitation of statistics, however, "without some evidence tending to show that they indicate a meaningful phenomenon," does not show discriminatory motive. *Albertson v. FMC Corp.*, 437 N.W.2d 113, 117 (Minn. Ct. App. 1989). A decrease in average age by itself does not support an inference of discrimination based on age. Variables other than impermissible motive could account for the changing demography of the workforce, and Noreen has not shown that his numbers are statistically significant.

Noreen's numbers, moreover, omit the first RIF conducted in 2012 and include two people hired to replace departing pharmacists several months after the last RIF in December 2013. Taking into account only the period encompassing RIFs of the type disputed by Noreen, the average age of full-time pharmacists was 52 before and after the series of RIFs. *See Stidham v. Minn. Mining & Mfg., Inc.*, 399 F.3d 935, 938

(8th Cir. 2005). Noreen also cites the average age of the pharmacists terminated by Teich (58.1) versus the average age of the pharmacists whom Teich hired (30.8). But when Teich began conducting the RIFs, almost half of the pharmacists were 60 or older; only two pharmacists were under 50, and one of them was terminated. A sample size of two hires in March and June 2014 is too small to be statistically significant. *See Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007). We are not convinced that Noreen's statistics support an inference that age was a motivating factor in the December 2013 RIF.

Noreen cites the fact that PharMerica's human resources department sent Rife and Teich information about which pharmacists were members of "protected classes" before the pharmacy director filled out matrix forms for the RIFs. That the directors were aware of the pharmacists' age, however, does not by itself tend to show that the decisions were motivated by age. To the contrary, the stated reason for considering information about "protected classes" during a RIF was to ensure—"per Federal guidelines"—that layoffs did not have an impermissible negative effect on employees in one of these categories.

Noreen makes much of isolated comments by Teich and Rife in urging an inference of discriminatory motive. But Teich's concern that pharmacists were "resistant to change" was not directed at a particular age group, and Teich's alleged comment to another pharmacist that "your generation is different from mine" is inadmissible hearsay. Rife's stray remark that a "new grad" is "fresh out of school," "generally very charged," and "energized," is not direct evidence of discriminatory motive. The comment was unrelated to Noreen's termination: Rife was explaining that he would "not necessarily" think it important for a staff pharmacist to be licensed as a pharmacist, because a "new grad" could have a "very nice clinical skill set" and other positive attributes. *See Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007); *Mittelstadt*, 2009 WL 1047903, at *4.

Noreen's complaint that PharMerica has provided shifting explanations also does not support an inference of discrimination. The company consistently stated that it terminated Noreen because a loss of business required a reduction in force. PharMerica said all along that it declined to rehire Noreen for the positions posted in early 2014 because those positions were never filled, and that the company did not rehire Noreen to replace the retiring pharmacist because of his unprofessional reaction to the termination.

For these reasons, we conclude that Noreen has not presented a submissible case of age discrimination under Minnesota law. It follows that Noreen's claim under the more demanding federal standard fails as well.

\* \* \*

Noreen understandably is frustrated that PharMerica deviated from written guidelines under which he likely would have been retained as a pharmacist. But Noreen cannot prevail in this lawsuit by showing sloppy management or arbitrary decisionmaking. He must establish that the company's decisions were motivated by his age. The company's regular practice of ranking all pharmacists together and terminating those with the lowest score is not sufficient evidence of age discrimination to defeat summary judgment. The balance of the evidence does not establish a submissible case. The judgment of the district court is affirmed.

_____