# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3066
_____

Leroy Johnson

*Plaintiff - Appellant*

v.

Westinghouse Air Brake Technologies Corporation, doing business as WABTEC

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: April 10, 2024
Filed: June 13, 2024
_____

Before BENTON, GRASZ, and STRAS, Circuit Judges.
_____

BENTON, Circuit Judge.

Leroy L. Johnson did not disclose key facts during a workplace investigation. Westinghouse Air Brake Technologies Corporation (Wabtec) fired him. After removal, the district court[1] granted summary judgment under the Missouri Human Rights Act ("MHRA"); Title VII of the Civil Rights Act of 1965 ("Title VII"); and

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

the Age Discrimination in Employment Act ("ADEA"). Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

Johnson worked as a supervisor for Wabtec at its Independence plant—the only salaried black employee during most of his time there. He supervised, trained, and interacted with employees to ensure they performed their jobs correctly. Johnson was also responsible to follow all company policies. Before the events here, he had uniformly positive reviews and a clean disciplinary record.

Wabtec implemented COVID workplace policies and protocols that generally followed the Center for Disease Control guidelines. Wabtec required employees to immediately notify their supervisor or HR if they were "exposed" to or come into "direct contact" with someone confirmed to have COVID-19.

Johnson was aware of these rules and expectations. His daughters, Shelia and Kelia, worked at the same plant. On Sunday, August 9, 2020, Johnson and his daughters learned that the daughters' cousin tested positive for COVID. That Monday, neither Johnson nor his daughters told their managers or HR that one of them interacted with the cousin. Shelia left work early on Monday, not feeling well. On Tuesday, Johnson told his direct supervisor, Devin Krahl, that "maybe Shelia was around the cousin." Krahl later said he was unsure whether Johnson said if he had been in contact with the cousin. Johnson and Kelia left to get tested.

Based on conversations with all three of them, Wabtec believed: (a) one or more of them had interacted with the COVID-positive cousin and with each other during the previous week; (b) they knew the cousin had tested positive before coming to work on Monday; (c) none of them notified management before coming to work on Monday, and (d) Johnson interacted with employees. Wabtec ordered a three-day shutdown of the plant. Wabtec sent all employees to be tested, suspending production at the plant.

Wabtec issued a Last Chance Agreement to Johnson, Shelia, and Kelia, which they signed. The Agreement stated:

> This Agreement is intended to serve as a last chance effort to address the Employee's inappropriate and complete disregard for the safety rules, failure to adhere to COVID-19 protocol as outlined by the Company, and irresponsible and disruptive behavior that resulted in increased health risk to co-workers, a plant shutdown, and ultimately financial loss.

Johnson's Agreement provided: (a) it would be in effect until September 4, 2021; (b) if Johnson committed any safety violation, misconduct, or noncompliance with corporate policies, or did not satisfactorily perform his job duties, he would be discharged immediately; (c) as a Production Supervisor, he needed to lead by example and be a role model to employees; (d) as a Production Supervisor, he should be a champion for safety, productivity, work ethic, teaching, and respect with the employees at the site; and (e) failure to comply with any term of the Agreement would subject him to immediate discharge.

On August 5, 2021, Shelia told the HR Manager, Caleb Carriere, that her partner had tested positive for COVID. Carriere directed her to get tested and to quarantine. Her results were negative. The following Wednesday, August 11, Shelia went to her father's house for about 30 minutes. That Friday, she again visited his house, telling him she felt like she had allergies. They discussed whether she should get tested that day; she did. The next day, Saturday, Johnson and the daughters attended a family event, which lasted about 30 minutes. Later that day, Shelia received positive results and alerted her father.

On Sunday, August 15, Johnson told Krahl that Shelia had tested positive. Johnson reported for work on Monday. That day, HR received an anonymous tip that Johnson may have been in contact with COVID. Krahl asked Johnson if he had this contact. Johnson said that after dropping balloons off at the family event on Saturday, he left. Out of caution, Wabtec sent Johnson home.

HR investigated. Carriere, leading the investigation, asked Johnson if he had been in contact with Shelia. Johnson mentioned contacting her only on Wednesday, August 11, for about 30 minutes. Interviewed, Shelia said she had been at her father's house on Friday, August 13, for ten minutes. Again questioned about contact with Shelia, Johnson admitted that she had been at his home on Friday, and also that she was present at the outdoor family event on Saturday, August 14.

Stacey Scharlatt, Wabtec's Vice President and HR Business Partner, decided that Johnson had violated his Agreement by contacts with a COVID-positive individual, without notifying Wabtec. In sum, Scharlatt decided:

> So again he had multiple contacts with an individual who was COVID positive and failed to, A, disclose that, came into work anyway, again, putting the population at risk and then when directly asked about the contact that he had had, he lied about that contact until he was subsequently asked again about the scope and magnitude of those interactions.

While acknowledging that Wabtec did not know definitively the nature of Johnson's contacts, Scharlatt concluded that Johnson knew Shelia was positive and failed to proactively alert anyone about the nature of the contact. Wabtec terminated Johnson.

Wabtec's general manager testified he did not recall who decided to terminate Johnson but did recall the group that did and why: because "he was in close proximity and did not acknowledge or advise of that close proximity of somebody that was COVID positive" and he violated the Agreement. The three Wabtec employees most involved in terminating Johnson—Scharlatt, Carriere, and a senior HR manager—were all white and decades younger than Johnson (who was about 66 years old when terminated).

Wabtec offered Johnson a severance payment of three weeks' pay, if he surrendered any right to assert claims for wrongful termination. Johnson refused.

-4-

He sued in state court for wrongful termination in violation of the MHRA, Title VII, and ADEA. After removal, the district court granted summary judgment for Wabtec.

"This court reviews de novo a grant of summary judgment." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To create a genuine dispute of fact, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute at those facts." *Torgerson*, 643 F.3d at 1042 (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (cleaned up).

Title VII and the MHRA serve the "narrow purpose of prohibiting discrimination" based on certain, discrete classifications, including age and race. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011); **42 U.S.C. §§ 2000e - 2000e-17** (prohibiting race and color discrimination); **§ 213.070.2, RSMo Supp. 2017** (prohibiting race, color, and age discrimination).

Because Johnson identifies no direct evidence of discrimination, his claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). *See Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 63 F.4th 721, 727-28 (8th Cir. 2023) (ADEA); *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 831 n.5 (8th Cir. 2020) (acknowledging that Missouri courts apply *McDonnell Douglas* to the MHRA); *Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016) (Title VII).

Johnson argues the district court improperly weighed evidence on summary judgment.

At summary judgment, claims based on indirect evidence must satisfy a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of race or color discrimination under Title VII or the MHRA, Johnson must show: (1) he is a member of a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Watson v. McDonough*, 996 F.3d 850, 855 (8th Cir. 2021) (Title VII); *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 973-74 (8th Cir. 2012) (MHRA); *see also Lampley v. Mo. Comm'n on Hum. Rts.*, 570 S.W.3d 16, 22 (Mo. banc 2019) ("When reviewing cases under the [MHRA], appellate courts are guided by both Missouri law and any federal employment discrimination (i.e., Title VII) case law that is consistent with Missouri law.") (cleaned up).

There is no dispute here about the first three elements of the prima facie case. The fourth element is disputed: Whether Johnson can establish an inference of discrimination "by showing more favorable treatment of similarly situated employees who are not in the protected class, biased comments by a decisionmaker, or that the employer failed to follow its own policies or shifted its explanation of the employment decision." *Mayorga v. Marsden Bldg. Maint. LLC*, 55 F.4th 1155, 1162 (8th Cir. 2022).

On this record, Johnson almost repudiated his claims of discrimination. Asked whether Wabtec terminated his employment because of his race, Johnson testified, "No. I'll say no." Asked whether he was treated less fairly, he said "Maybe, maybe because of race. I'd have no clue. But why would I say that."

Johnson agreed that no current or former Wabtec employees made any statements to him suggesting race discrimination. But he argues he established a prima facie case by showing that Wabtec treated similarly situated white employees

more favorably than him. Johnson points to Betty Bonham and James Jones as receiving offers for higher severance pay than his. But both of them, two older salaried white employees, were not similarly situated because of the nature of their separations. Unlike Johnson, neither Bonham nor Jones were terminated for misconduct. Bonham was involuntarily laid off, Jones fired due to a reduction in force. Though Jones had a last chance agreement in place, he was not discharged for violating it—as Johnson was. These differences demonstrate they were not "similarly situated in all relevant respects." *Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 774 (8th Cir. 2016), *quoting Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014).

Johnson counters, asserting Wabtec fabricated a reason to terminate him, thus treating him differently than Bonham and Jones. Johnson cites no evidence of fabrication, except for claiming he did not violate *all* the COVID policies. Johnson asserts his notification to Krahl on Sunday, August 15, complied with Wabtec's policies. Even so, Johnson violated the Agreement by his non-disclosures. The Agreement subjected Johnson to immediate discharge for safety violations, misconduct, and unsatisfactory performance of job duties. Even if Johnson's interactions with Shelia between Wednesday and Saturday did not meet the CDC definition of "close contact," Johnson failed to disclose to Carriere the circumstances of the interactions until after confronted about omissions. The Agreement and its precipitating facts put Johnson on notice that he had to be completely candid about any potential exposure to COVID.

Johnson emphasized that he made significant disclosures to Krahl who told him to come to work on Monday. Johnson, however, did not tell the full story to investigator Carriere when first questioned. Wabtec could reasonably believe Johnson's failure to be fully candid was a safety concern, amounting to misconduct. Johnson's misconduct was a ground for termination, beyond any COVID policy violations. The district court properly granted summary judgment on Johnson's MHRA and Title VII claims.

This Court need not address the ADEA claim because on appeal, Johnson waived this claim. In his opening brief on this claim, he argues only that he did not waive it at the district court and disagrees with the district court's application of Eighth Circuit precedent on waiver. At no point does Johnson address the merits of his claim, thus waiving any challenge to them. Summary judgment was properly granted on the ADEA claim. *See **United States ex rel. Ambrosecchia v. Paddock Labs., LLC***, 855 F.3d 949, 954 (8th Cir. 2017) (claims not raised in an opening brief are deemed waived).

\* \* \* \* \* \* \*

The judgment is affirmed.

_____